IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Ryan Lawrence, | No. CV-06-1422-PHX-GMS (LOA) |
| Petitioner, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Dora B. Schriro, et al., | |
| Respondents. | |

This matter arises on Petitioner's Amended Petition for Writ of Habeas Corpus. (docket # 26)  Respondents have filed an Answer (docket # 35) to which Petitioner has replied (docket # 36).

## I.  Factual and Procedural Background

### A. Factual Background

The following events gave rise to Petitioner's challenged convictions and sentences.   During the early morning hours of August 18, 1996, Petitioner was at a nightclub in Scottsdale, Arizona.  (Respondents' Exh. A at 1, Exh. FF at 7-9, 15-19, 74)  At approximately 2:00 a.m., Petitioner got into a verbal confrontation with Phillip Michael Ramos, Adrian Rodriguez, Russel Schwartz, and Forrest Wald.  (Respondents' Exh. A at 2; Exh. B at 2; Exh. FF at 32; Exh. GG at 80, 93-101) The confrontation escalated, and Petitioner pulled a handgun from the waistband of his pants and shot Ramos from a close distance.  (Respondents' Exh. A at 3; Exh. B at 3; Exh. FF at 35-41; Exh. GG at 109-110; Exh. HH at 143)  Rodriguez, Schwartz, Wald, and an off-duty Phoenix Police Officer, who

1  was also a patron at the night club, tried to prevent Petitioner from leaving the scene in a car

2  along with his companions, including Daryl "Sleepy" Jones.  (Respondents' Exh. A at 4;

3  Exh. B at 2; Exh. FF at 61; Exh. II at 48-50) The men surrounded the car, kicking it and

4  jumping on it. Because the driver had difficulty getting the car in gear, the car remained

5  stationary while the men attacked it.  (Respondents' Exh. B at 2; Exh. FF at 61; Exh. HH at

6  139; Exh. II at 50)  Petitioner fired additional shots from inside the car, striking two of the

7  men who were surrounding the vehicle.  (Respondents' Exh. A at 6; Exh. B at 2; Exh. FF at

8  55-58, 62; Exh. HH at 139-44) The driver eventually succeeded in driving away from the

9  scene.  (Respondents' Exh. B at 2; Exh. FF at 61)  All three men shot by Petitioner died as a

10 result of their injuries.  (Respondents' Exh. B at 2)

11 **B.  Charges and Trial**

12 On August 29, 1996, the State of Arizona charged Petitioner with three counts of

13 first degree murder, class 1 dangerous felonies, and two counts of aggravated assault, class 3

14 dangerous felonies.  (Respondents' Exh. C) Petitioner was eventually tried for the first-

15 degree murders of the three men as well as the assault of the off-duty police officer.  The

16 other aggravated assault charges were dismissed before trial.  (Respondents' Exh. B at 2)

17 On April 6, 1999, a jury convicted Petitioner of two counts of second degree murder, one

18 count of manslaughter, and one count of aggravated assault.  (Respondents' Exh. B at 2;

19 Exhs. D-G) The court[1] sentenced Petitioner to consecutive sentences totaling 50 years.

20 (Respondents' Exh. B at 2)

21 **C.  Direct Appeal**

22 Petitioner timely filed a direct appeal raising several claims: (1) the trial court

23 erred by giving the jury an instruction regarding arrests by private persons; (2) the trial court

24 erred by giving a "dynamite" instruction upon learning that the jury was deadlocked; (3) the

---

27  [1]  The Honorable Barbara M. Jarrett presided over the proceedings in the Arizona

28 Superior Court, Maricopa County.

1  trial court erred by denying Petitioner's request for a *Willits*[2] instruction; and (4) the court

2  erred by overruling defense counsel's objection to the prosecutor's improper closing

3  argument.  (Respondents' Exh. H) On August 29, 2000, the Arizona Court of Appeals

4  rejected Petitioner's claims and affirmed his convictions and sentences.  (Respondents' Exh.

5  B) Petitioner sought review in the Arizona Supreme Court which was denied on February 1,

6  2001.  (Respondents' Exh. I at 2; Exh. EE at 2)

7  **D.  First Post-Conviction Proceeding**

8  On September 3, 2002, Petitioner filed his first notice and petition for post-

9  conviction relief. (Respondents' Exh. J)   Petitioner asserted that he was denied a fair trial

10  because the trial court empaneled a biased jury.  (Respondents' Exh. J at 1) Petitioner also

11  argued that trial counsel was ineffective for failing to: (1) strike a biased juror; (2) introduce

12  evidence of the victims' blood alcohol content; (3) call an eyewitness; (4) move for a

13  mistrial or request a curative instruction based on the State's improper closing argument; and

14  (5) object to a supplemental jury instruction pertaining to citizen's arrest.  (Respondents'

15  Exh. J) On January 1, 2004, the trial court denied relief.  (Respondents' Exh. I, K)

16  Petitioner appealed and the Arizona Court of Appeals summarily denied review on July 14,

17  2005.  (Respondents' Exh. L, M)

18  **E.  Second Post-Conviction Proceeding**

19  On October 11, 2005, Petitioner filed a second notice of petition for post-

20  conviction relief.  (Respondents' Exh. N) On November 7, 2005, the trial court denied

21  review, concluding that the notice was untimely and that Petitioner failed to provide

22  sufficient evidence to excuse his untimely filing.  (Respondents' Exh. O)  Petitioner did not

23  seek review in the Arizona Court of Appeals.

24

25

---

26  [2] Under *State v. Willits*, 96 Ariz. at 191, 393 P.2d at 281, if the State lost, destroyed, or

27  failed to preserve evidence whose contents or quality is important to the case and the explanation for the loss is inadequate, the jury may assume the evidence is unfavorable to the

28  State.

### F.  Third Post-Conviction Proceeding

On April 27, 2006, Petitioner filed an untimely third notice of post-conviction relief.  (Respondents' Exh. P, Q)  To excuse his untimely filing, Petitioner argued that his claim was based on newly discovered evidence which could not have been discovered at an earlier date.  (Respondents' Exh. R) On June 6, 2006, the trial court found that Petitioner had sufficiently raised a claim of newly discovered evidence under Arizona Rules of Criminal Procedure 32.1(e) to allow the Rule 32 proceedings to proceed "<u>only as to the claim of newly discovered material facts</u>." (Respondents' Exh. Q) (emphasis in original)

In support of his third petition for post-conviction relief, Petitioner submitted an affidavit of Daryl Lemar Jones, in which Jones claimed that Petitioner may not have shot one of the victims.  (Respondents' Exhs. R, S)  On October 18, 2006, the court found that Petitioner had presented a colorable claim and scheduled an evidentiary hearing for December 1, 2006.  The Court concluded that "if the allegations in the Affidavit of Daryl Lemar Jones [were] true, the outcome of one or more of the Defendant's convictions may have been different." (Respondents' Exh. T)

On June 1, 2006, while his third petition for post-conviction relief was still pending, Petitioner, through counsel, filed a Petition for Writ of Habeas Corpus asserting the following six grounds for relief: (1) he was denied a fair trial because a biased juror sat on the jury that decided his case (Ground 1); (2) counsel rendered ineffective assistance by (1) failing to strike a biased juror (Ground 2), (b) failing to introduce evidence of the victims' blood alcohol content (Ground 3); (c) failing to call a witness (Ground 4); (d) failing to move for a mistrial based on the prosecutor's improper closing argument (Ground 5); (e) and failing to object to a supplemental jury instruction (Ground 6).  (docket # 1) Petitioner subsequently filed a motion to stay the federal habeas corpus proceedings until the conclusion of the state matters.  (Respondents' Exh. V) On January 31, 2007, this Court ordered that the habeas corpus proceedings be stayed and held in abeyance.  (Respondents' Exh. W)

1    In the meantime, on December 1, 2006, the state court held an evidentiary

2    hearing on Petitioner's third petition for post-conviction relief and took the matter under

3    advisement.  (Respondents' Exh. Y)  On February 16, 2007, the court denied the petition for

4    post-conviction relief.  (Respondents' Exh. Y)  In so doing, the court found that, although

5    Jones claimed that he had fired a weapon on the night in question, his testimony was

6    "wholly incredible and unreliable."  (Respondents' Exh. Y)  The court found "that Jones, a

7    friend of [Petitioner], has provided a version of events that is impossible to verify or

8    substantiate in any factual way, and that any reasonable interpretation of the facts is

9    inconsistent with Jones' claim that he shot a gun that night from inside the little, crowded

10   car."  (*Id.*)   Accordingly, Petitioner "failed to sustain his burden of proving his allegations

11   by a preponderance of the evidence."  (*Id*.)

12   Petitioner appealed and on May 9, 2008, the Arizona Court of Appeals denied

13   review of the trial court's denial of post-conviction relief.  (Respondents' Exh. Z)

### G.  Amended Petition for Writ of Habeas Corpus

15   On June 26, 2008, Petitioner filed an Amended Petition for Writ of Habeas

16   Corpus in this court asserting the same claims raised in his original petition and adding a

17   claim that the denial of his third petition for post-conviction relief violated the Fourteenth

18   and Sixth Amendments.  (docket # 26)  Respondents concede that the pending Petition for

19   Writ of Habeas Corpus is timely filed.  (docket # at 35)

## II.  Exhaustion and Procedural Bar

21   Pursuant to 28 U.S.C. § 2254(b)(1), before a federal court may consider a state

22   prisoner's application for a writ of habeas corpus, the prisoner must have exhausted, in state

23   court, every claim raised in his petition.  *Coleman v. Thompson*, 501 U.S. 722, 731 (1991).

24   To properly exhaust state remedies, the prisoner must have afforded the state courts the

25   opportunity to rule upon the merits of his federal constitutional claims by "fairly presenting"

26   them to the state courts in a procedurally appropriate manner.  *Castille v. Peoples*, 489 U.S.

27   346, 349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (stating that "[t]o provide the

28

State with the necessary 'opportunity,' the prisoner must 'fairly present' her claim in each appropriate state court . . . thereby alerting the court to the federal nature of the claim.").

It is not enough that all of the facts necessary to support the federal claim were before the state court or that a "somewhat similar" state law claim was raised. *Reese*, 541 U.S. at 28 (stating that a reference to ineffective assistance of counsel does not alert the court to federal nature of the claim). Rather, the habeas petitioner must cite in state court to the specific constitutional guarantee upon which he bases his claim in federal court. *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001). Similarly, general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish fair presentation of a federal constitutional claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general appeal to a constitutional guarantee," such as a naked reference to "due process," or to a "constitutional error" or a "fair trial"). Similarly, a mere reference to the "Constitution of the United States" does not preserve a claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). Even if the basis of a federal claim is "self-evident" or if the claim would be decided "on the same considerations" under state or federal law, the petitioner must make the federal nature of the claim "explicit either by citing federal law or the decision of the federal courts . . . ." *Lyons*, 232 F.3d at 668. A state prisoner does not fairly present a claim to the state court if the court must read beyond the petition or brief filed in that court to discover the federal claim. *Baldwin*, 541 U.S. at 27.

Where a prisoner fails to "fairly present" a claim to the State courts in a procedurally appropriate manner, state court remedies may, nonetheless, be "exhausted." This type of exhaustion is often referred to as "procedural default" or "procedural bar." *Ylst v. Nunnemaker*, 501 U.S. 797, 802-05 (1991); *Coleman*, 501 U.S. at 731-32. There are two categories of procedural default.

First, a state court may have applied a procedural bar when the prisoner attempted to raise the claim in state court. *Nunnemaker*, 501 U.S. at 802-05. If the state

court also addressed the merits of the underlying federal claim, the "alternative" ruling does not vitiate the independent state procedural bar. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (state supreme court found ineffective assistance of counsel claims "barred under state law," but also discussed and rejected the claims on the merits, *en banc* court held that the "on-the-merits" discussion was an "alternative ruling" and the claims were procedurally defaulted and barred from federal review).  A higher court's subsequent summary denial of review affirms the lower court's application of a procedural bar. *Nunnemaker*, 501 U.S. at 803.

Second, the state prisoner may not have presented the claim to the state courts, but pursuant to the state courts' procedural rules, a return to state court would be "futile." *Teague v. Lane*, 489 U.S. 288, 297-99 (1989).  Generally, any claim not previously presented to the Arizona courts is procedurally barred from federal review because any attempt to return to state court to properly exhaust a current habeas claim would be "futile." Ariz. R. Crim. P. 32.1, 32.2(a) & (b); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185 Ariz. 319, 322-27, 916 P.2d 1035, 1048-53 (1996); Ariz. R. Crim. P. 32.1(a)(3) (relief is precluded for claims waived at trial, on appeal, or in any previous collateral proceeding); 32.4(a); Ariz. R. Crim. P. 32.9 (stating that petition for review must be filed within thirty days of trial court's decision).  A state post-conviction action is futile where it is time barred. *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under Rule 32.2(a)).

In either case of procedural default, federal review of the claim is barred absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Dretke v. Haley*, 541 U.S. 386, 393-94, (2004);  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To establish cause, a petitioner must establish that some objective factor external to the defense impeded her efforts to comply with the state's procedural rules. *Id.*  The following objective factors may constitute cause: (1) interference by state officials, (2) a showing that the factual

1    or legal basis for a claim was not reasonably available, or (3) constitutionally ineffective

2    assistance of counsel. *Id.*   To establish prejudice, a prisoner must demonstrate that the

3    alleged constitutional violation "worked to his actual and substantial disadvantage, infecting

4    his entire trial with error of constitutional dimension." *United States v. Frady*, 456 U.S. 152,

5    170 (1982).  Where petitioner fails to establish cause, the court need not reach the prejudice

6    prong. To establish a "fundamental miscarriage of justice" resulting in the conviction of one

7    who is actually innocent, a state prisoner must establish that it is more likely than not that no

8    reasonable juror would have found him guilty beyond a reasonable doubt in light of new

9    evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); 28 U.S.C. § 2254(c)(2)(B).

10              **A.  Application of Law to Petitioner's Claims**

11              Respondents assert that Petitioner did not properly exhaust Grounds 1, 5, 7 and

12   that those claims are technically exhausted and procedurally barred from federal habeas

13   corpus review.

14              **1.  Ground 1**

15              In Ground 1, Petitioner asserts that he was denied a fair trial because the trial

16   court empaneled a biased juror.  (docket # 1 at 5)   Respondents assert that this claims is

17   procedurally defaulted.

18              The record reflects that Petitioner did not raise the claim asserted in Ground 1 on

19   direct appeal.  Petitioner, however, attempted to raise this claim in his first petition for post-

20   conviction relief.  (Respondents' Exh. J) The trial court found that Petitioner's "claim of a

21   biased juror is precluded pursuant to [Arizona Rule of Criminal Procedure] 32.2(a)(3) by

22   failure to raise the claim in his direct appeal to the Court of Appeals."  (Respondents' Exh. I

23   at 3) Petitioner appealed and the appellate court summarily affirmed the trial court's denial

24   of Petitioner's petition for post-conviction relief.  (Respondents' Exh. M)  The appellate

25   court's summary denial affirms the trial court's application of a procedural bar.

26   *Nunnemaker*, 501 U.S. at 803.

27              By virtue of the state court's application of a procedural bar to Petitioner's claim

28   raised in Ground 1, that claim is technically exhausted and procedurally barred.

1    *Nunnemaker*, 501 U.S. at 802-05. Thus, Ground 1 is not subject to federal habeas corpus

2    review unless Petitioner establishes cause and prejudice or a fundamental miscarriage of

3    justice.  As discussed in Section II.B and II.C, *infra*, Petitioner does not establish any basis

4    for overcoming the procedural bar.

5            **2.  Ground 5**

6            Respondents also assert that Petitioner procedurally defaulted Ground 5. In

7    Ground 5, Petitioner argues that trial counsel was ineffective for failing to move for a

8    mistrial or request a curative instruction when the prosecutor repeatedly shifted the burden

9    of proof during cross-examination and closing argument.  (docket # 1 at 9)

10           The record reflects that, although Petitioner raised this claim to the trial court on

11   post-conviction review, he never presented it to the Arizona Court of Appeals.

12   (Respondents' Exhs. J,  L, M, N) As discussed in Sections II.B and II.C below, because

13   Petitioner never presented Ground 5 to the Arizona Court of Appeals, it is procedurally

14   defaulted and not subject to habeas corpus review.  28 U.S.C. § 2254(b)(1)(A).

15           **3.  Ground 7**

16           In Ground 7, asserted in the Amended Petition for Writ of Habeas Corpus

17   (docket # 26), Petitioner argues that the trial court's denial of third petition for post-

18   conviction relief violates his Sixth and Fourteenth Amendment rights.  (docket # 26 at 2)

19           During his third post-conviction proceeding, Petitioner argued that "newly

20   discovered material facts would have changed the verdicts and sentences in this case."

21   (Respondents' Exhs. P, R)   Petitioner, however, did not raise a federal claim.  Likewise, it

22   does not appear that he raised a federal challenge regarding the denial of his third post-

23   conviction proceeding to the Arizona Court of Appeals.  (Respondents' Exh. Z, docket # 26)

24   The newly discovered evidence upon which Petitioner based his third petition for post-

25   conviction relief, was the January 2006 affidavit of Daryl Jones averring that he fired a

26   "weapon at the time of [the] incident and that weapon could have caused one of the deaths."

27   (Respondents' Exhs. P, R)  Petitioner's presentation of a state law claim is not sufficient to

28   fairly present a federal claim based on the same facts.  It is not enough that all of the facts

necessary to support the federal claim were before the state court or that a "somewhat similar" state law claim was raised. *Reese*, 541 U.S. at 28 (stating that a reference to ineffective assistance of counsel does not alert the court to federal nature of the claim). Rather, the habeas petitioner must cite in state court to the specific constitutional guarantee upon which he bases his claim in federal court. *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir. 2001). Similarly, general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish fair presentation of a federal constitutional claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general appeal to a constitutional guarantee," such as a naked reference to "due process," or to a "constitutional error" or a "fair trial"). A mere reference to the "Constitution of the United States" does not preserve a claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). Even if the basis of a federal claim is "self-evident" or if the claim would be decided "on the same considerations" under state or federal law, the petitioner must make the federal nature of the claim "explicit either by citing federal law or the decision of the federal courts . . . ." *Lyons*, 232 F.3d at 668.

Petitioner did not raise Ground 7 in State court as a federal claim. Rather, he presented it as a state law claim. (Respondents' Exh. P, R, Y) The trial court, therefore, considered the claim only on the basis of state law. (Respondents' Exh. Y) Petitioner did not exhaust state remedies with respect to Ground 7 and that claim is procedurally defaulted. And, as discussed below, Petitioner does not establish any basis for overcoming the procedural bar.

## B. Procedural Default

Petitioner's failure to properly present the federal claims asserted in Grounds 1, 5 and 7 to the Arizona state courts renders those claims technically exhausted and procedurally defaulted because Arizona's procedural rules prohibit Petitioner from returning to state court to raise those claims. Generally, any claim not previously presented to the

1    Arizona courts is procedurally barred from federal review because any attempt to return to

2    state court to properly exhaust a current habeas claim would be "futile."  Ariz. R. Crim. P.

3    32.1, 32.2(a) & (b); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185

4    Ariz. 319, 322-27, 916 P.2d 1035, 1048-53 (1996); Ariz. R. Crim. P. 32.1(a)(3) (relief is

5    precluded for claims waived at trial, on appeal, or in any previous collateral proceeding);

6    32.4(a); Ariz. R. Crim. P. 32.9 (c) (stating that "within thirty days after the final decision of

7    the trial court on the petition for post-conviction relief . . . any party aggrieved may petition

8    the appropriate appellate court for review . . . .").  A state post-conviction action is futile

9    where it is time-barred.  *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th

10   Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal

11   of an Arizona petition for post-conviction relief, distinct from preclusion under Rule

12   32.2(a)).  Here, the deadline for Petitioner to seek state post-conviction review has long

13   expired.  Specifically, Rule 32.4 of the Arizona Rules of Criminal Procedure provides that in

14   non-capital cases, "the notice [of post-conviction relief] must be filed within ninety days

15   after entry of judgment and sentence or within thirty days after the issuance of the order and

16   mandate in the direct appeal, whichever is later. . . ."  Ariz.R.Crim.P. 32.4; *White v. Lewis*,

17   874 F.2d 599, 602 (9th Cir. 1989) (affirming the district court's dismissal of a petition for

18   writ of habeas corpus because state prisoner lacked a "currently available state remedy at the

19   time of the federal petition.")  Additionally, Arizona law precludes Petitioner's claims in a

20   subsequent petition for post-conviction relief.  Ariz. R. Crim.P. 32.2(a)(1) (providing that a

21   claim that could have been raised on direct appeal is precluded from post-conviction review;

22   Ariz.R.Crim.P. 32.2(a)(2) (providing that a claim that has "been finally adjudicated on the

23   merits on appeal or in any previous collateral proceeding" is precluded from review; and

24   Ariz.R.Crim.P. 32.2(a)(3) (precluding post-conviction relief upon any ground "that has been

25   waived at trial on appeal, or in any previous collateral proceeding."); *Mata*, 185 Ariz. at 332,

26   916 P.2d at 1048 (defendant waived his claim that defendant's counsel was ineffective

27   where defendant did not raise that claim in first or second petition for post-conviction relief.)

28

1   Because Petitioner did not properly present Grounds 1, 5 and 7 to the Arizona

2   state courts, these claims are procedurally barred.  Accordingly, the Court need not reach the

3   merits of these claims unless Petitioner establishes either "cause and prejudice" or a

4   "fundamental miscarriage of justice."  *Moorman v. Schriro*, 426 F.3d 1044, 1058 (9th Cir.

5   2005) (stating that "[a] prisoner who fails to comply with state procedures cannot receive

6   federal habeas corpus review of a defaulted claim unless the petitioner can demonstrate

7   either cause for the default and resulting prejudice, or that failure to review the claims would

8   result in a fundamental miscarriage of justice.") (citing *Coleman v. Thompson*, 501 U.S. 722,

9   750 (1991)).

10   **C.  "Cause and Prejudice" or "Fundamental Miscarriage of Justice"**

11   The Court need not reach the merits of Petitioner's procedurally defaulted claims

12   unless he establishes either "cause and prejudice" or a "fundamental miscarriage of justice."

13   **1.  Cause and Prejudice**

14   Proof of cause "ordinarily turn[s] on whether the prisoner can show that some

15   objective factor external to the defense impeded" his compliance with the state rule.  *Dretke*,

16   541 U.S. at 393-94.  In this case, Petitioner does not assert any basis sufficient to overcome

17   the procedural bar.  (docket # 36 at 2)  Petitioner's *pro se* status and ignorance of the law do

18   not satisfy the cause standard. *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 908

19   (9th Cir. 1986); *Kibler v. Walters*, 220 F.3d 1151, 1153 (9th Cir. 2000).

20   **2.  Fundamental Miscarriage of Justice**

21   In his Reply, Petitioner asserts that failure to consider Ground 7 will result in a

22   fundamental miscarriage of justice.  (docket # 36)  "[T]he miscarriage of justice exception is

23   concerned with actual as compared to legal innocence."  *Calderon* v. *Thompson*, 523 U.S.

24   538, 559 (1998) (quoting *Schlup v. Delo*, 513 U.S. 208, 324 (1995).  "'To be credible,' a

25   claim of actual innocence must be based on reliable evidence not presented at trial." *Id.* at

26   559 (1998) (quoting *Schlup*, 513 U.S. at 324.  The Supreme Court has explained that:

27   The meaning of actual innocence as formulated by *Sawyer* and *Carrier*
     does not merely require a showing that a reasonable doubt exists in light

28

- 12 -

of the new evidence, but rather that no reasonable juror would have found
the defendant guilty.  It is not the district court's independent judgment as
to whether reasonable doubt exists that the standard addresses; rather the
standard requires the district court to make a probabilistic determination
about what reasonable, properly instructed jurors would do.  Thus, a
petitioner does not meet the threshold requirement unless he persuades the
district court that, *in light of the new evidence, no juror, acting reasonably,
would have voted to find him guilty beyond a reasonable doubt.*

*Schlup*, 513 U.S. at 329 (emphasis added); *see also Lorensten v. Hood*, 223 F.3d 950, 954

(9th Cir. 2000) ("Petitioner bears the burden of proof on this issue by a preponderance of the

evidence, and he must show not just that the evidence against him was weak, but that it was

so weak that no reasonable juror would have convicted him."). To establish a claim of actual

innocence, petitioner must demonstrate that "it is more likely than not that no reasonable

juror would have convicted him in light of the new evidence presented in his habeas

petition." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998).  The "actual innocence"

exception is narrow and "claims of actual innocence are rarely successful." *Schlup*, 513

U.S. at 324.  *See also Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002)("The

Supreme Court has stressed the narrow scope of the actual innocence exception . . . .")

Petitioner does not establish that failure to consider Ground 7 will result in a

fundamental miscarriage of justice.   The new evidence, the 2006 affidavit of Daryl Jones,

does not satisfy Petitioner's burden of proving by preponderance of the evidence that no

reasonable juror would have found him guilty beyond a reasonable doubt in light of that new

evidence. *Schlup*, 513 U.S. at 324.

Petitioner's claim of actual innocence is based on the January 26, 2006 affidavit

of Daryl Lemar Jones ("Jones").  In the affidavit, Jones avers that during his August 20,

1996 interview with the Scottsdale Police regarding the incident at the Scottsdale night club,

he was "not truthful when [he] was questioned about whether or not there were other guns

involved in this case."  (docket # 26-2)  Jones avers that he had a ".25 caliber revolver in

[his] backpack on the night of the incident."  (*Id*.)  He further states that he did not tell the

Scottsdale Police Officers "that when [he] was in the vehicle [he] removed the revolver from

1   his back pack and without looking fired it outside the broken rear seat passenger window."

2   (docket # 26-2)

3         Based on Jones' affidavit, during Petitioner's third post-conviction proceeding,

4   the trial court conducted an evidentiary hearing.  The court heard the testimony of Jones,

5   Forrest Wald, and Petitioner.  The court also considered the trial transcripts[3] which

6   Petitioner had submitted in support of his claim that he was actually innocent.  The trial

7   court concluded that Jones's testimony was "incredible and unreliable" and that the version

8   of events to which he testified was "impossible to verify or substantiate."  (Respondents'

9   Exh. Y) The court concluded that "Jones' testimony would not have changed the verdict had

10  it been presented because it is incredible."  (Respondents' Exh. Y)

11        As discussed below, after review of the "new evidence," the Court finds that

12  Petitioner fails to establish that "it is more likely than not that no reasonable juror would

13  have convicted him in light of the new evidence presented in his habeas petition."

14  *Thompson*, 523 U.S. at 559.  Thus, Petitioner has failed to overcome the procedural bar to

15  Ground 7.   Moreover, even if Petitioner's claim raised in Ground 7 were properly before

16  this Court, Petitioner has not established that the state court's resolution of this third petition

17  for post-conviction relief rested on an unreasonable determination of the facts or was

18  contrary to or an unreasonable application of federal law.  28 U.S.C. § 2254(d).  The state

19  court found that Jones' affidavit made ten years after the incident at issue and his testimony

20  during the state court's evidentiary hearing is not credible.  The state court's factual

21  determination are "presumed correct" on habeas corpus review and Petitioner has not

22       _____

23       [3] Petitioner argues that the trial court did not consider the entire trial transcript and

24  indicated that the transcript was too voluminous for the court to consider.  (docket # 36)
    During the evidentiary hearing, the trial court reminded Petitioner, who was represented by

25  counsel, that it was his responsibility to identify the portions of the trial transcript which were
    relevant to his claims.  (Respondents' Exh. X at 135) The court provided Petitioner ample

26  opportunity to identify the relevant portions of the transcript and Petitioner did provide the court
    with transcripts on December 21, 2006, which the state court "reviewed." (Respondents' Exh.

27  Y at 2) Petitioner's assertion that the state court failed to sufficiently review the trial transcript

28  lacks merit.

1    rebutted that presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

2    Petitioner's burden is considerable because "this standard means that the federal habeas

3    court must 'more than simply disagree' with the state fact-finding."  *Washington v. Schriver*,

4    255 F.3d 45, 55 (2nd Cir. 2001).

5         As set forth above, the incident on August 18, 1996, started with a verbal

6    confrontation in the parking lot of a Scottsdale night club.  That night, Wald and three

7    friends were leaving a club when they came across Petitioner and his friends in the parking

8    lot.  (Respondents' Exh. GG at 97-109; Exh. KK at 65)  Petitioner and one of the victims,

9    Michael Ramos, exchanged words and Petitioner shot and killed Ramos.  (Respondents'

10   Exh. FF at 32-37; Exh. GG at 109)  Petitioner and his five friends got into a small car, a

11   "Neon," to flee the scene.  (Respondents' Exh. II at 49-50)  Shots were fired before and after

12   Petitioner fled.  (Respondents' Exh. FF at 43, 55-56)  Wald and his remaining two friends

13   punched and jumped on the car to try to prevent Petitioner from leaving or to mark the car so

14   that it could be identified.  (Respondents' Exh. FF at 56-57; Exh. II at 50)  At this point,

15   Defendant was in the middle position in the back seat, with Jones on his right and Laurie

16   Honaker on his left.  (Respondents' Exh. HH at 139, II at 48)

17        The car in which Petitioner was riding was able to leave the parking lot.

18   (Respondents' Exh. FF at 61; Exh. HH at 139-40)  Other than "nicks and scratches" from

19   broken glass, neither Petitioner nor his friends were injured.  (Respondents' Exh. HH at 142)

20   After the incident, Petitioner disposed of his gun, cleaned up the damaged car, and made

21   plans to leave town, and then left for Las Vegas.  (Respondents' Exh. X at 107-112)

22        On August 18, 1996, Jones was interviewed by Scottsdale Police.  (docket # 26-

23   2, Affidavit of Daryl Lemar Jones)  At time, he denied possessing a gun on the night in

24   question.  (*Id.*; Exh. X at 28-29)  He claims that he never told Petitioner or his attorney, or

25   the prosecutor that he had a gun with him or that he fired it.  (Respondents' Exh. X at 30)

26   He also claims that he never talked to Petitioner about the shooting and did not know

27   Petitioner was on trial for the shootings.  (Respondents' Exh. X at 32, 57, 73)

28

1           Ten years after the incident at issue, Jones now claims that he had a gun with him

2 that night, inside his soccer shoe in his backpack, that he pulled out his gun while Wald and

3 his friends were attacking the car, and without raising his head and without looking, he

4 "stuck [his] arm out the window," shot "a couple of rounds," and then put the gun back in

5 his backpack.  (Respondents' Exh. X at 22-23, 50, 73)  Jones claims that he did not tell

6 police he had a firearm during his interview in 1996 because he was "scared" he would be

7 charged with "murder" or "aggravated assault with a weapon or something."  (Respondents'

8 Exh. X at 28)  He claims that he came forward in 2006 because "[i]t's been eating [him]

9 inside for a long time."  (Respondents' Exh. X at 44)  He was "really feeling guilty inside."

10 (Respondents' Exh. X at 32)

11           During the evidentiary hearing before the State court, Jones also testified that

12 even though his affidavit states that the gun was a ".25 caliber," could not recall whether the

13 gun was a .22 or a .25 caliber revolver and did not remember how he acquired the gun.

14 (docket # 26-2; X at 31, 50-51)  He claimed that he bought the gun a few years before the

15 August 18, 1996 incident, and that it had bullets in it when he bought it.  (Respondents' Exh.

16 X at 52-53)  He testified that he had never shot the gun before the incident and that he never

17 removed the bullets or unloaded the gun.  (Respondents' Exh. X at 55)  He claimed he had

18 the gun in his backpack on the night of the incident "for protection."  (Respondents' Exh. X

19 at 55)  Jones testified that the gun did not have a silencer and confirmed that he was sitting

20 next to Petitioner in the back seat of the car when Jones fired the gun.  (Respondents' Exh. X

21 at 20, 59) Honaker, who was sitting next to Jones, never heard or saw Jones fire a gun.

22 (Respondents' Exh. X at 20, 61)  Likewise, the three people in the front of the car never said

23 that they saw or heard Jones fire a gun.  (*Id*.)

24           Jones testified that, after the August 18, 1996 incident, he kept his gun for a few

25 weeks and then sold it.  (Respondents' Exh. X at 31-32)  He did not remember details of that

26 sale.  (Respondents' Exh. X at 32, 55)  Jones had been convicted of a felony, Soliciting to

27 Commit a Burglary, in 1994, and served just over a year in Florence.  (Respondents' Exh. X

28

at 34-35)  Jones claimed that the did not know his felony conviction made it unlawful for him to possess a gun.  (Respondents' Exh. X at 35)  The record reflects that no other witnesses, nor Petitioner, nor the other four occupants of the car, ever saw Jones with a gun or saw Jones fire a gun.  Wald did not see an arm stick out of the car's rear side window and fire a gun.  (Respondents' Exh. X at 89-90)

Petitioner testified that, even though he was seated next to Jones in the back seat of the small car when Jones claims he reached into his backpack, removed his gun, fired a few rounds, and then put the gun back in his backpack, Petitioner did not speak to Jones about the incident because Petitioner "had no idea that he had anything to do with the incident." (Respondents' Exh. X at 105, 113)  Petitioner testified that, in his mind, there was "[n]ot a chance in the world" that Jones had been involved in the shooting. (Respondents' Exh. X at 105)

Jones' affidavit and his testimony during the state court's evidentiary hearing do not make it more likely than not that no reasonable juror would have convicted Petitioner in view of Jones' testimony.  *Calderon*, 523 U.S. at 559.  Accordingly, Petitioner fails to establish that failure to consider his procedurally defaulted claims will result in a fundamental miscarriage of justice.  Because Petitioner has not established any basis to overcome the procedural bar to his defaulted claims, the Court will not reach the merits of Grounds 1, 5, and 7.  The Court will consider Petitioner's remaining claims after discussing the standard of review.

**III.  Standard of Review**

Under the AEDPA, a state prisoner "whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price v. Vincent*, 538 U.S. 634, 638 (2003).  Thus, a state prisoner is not entitled to relief unless he demonstrates that the state court's adjudication of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or

1   "resulted in a decision that was based on an unreasonable determination of the facts in light

2   of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2); *Carey*

3   *v. Musladin*, 549 U.S. 70 (2006); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003); *Mancebo*

4   *v. Adams*, 435 F.3d 977, 978 (9th Cir. 2006).  To determine whether a state court ruling was

5   "contrary to" or involved an "unreasonable application" of federal law, courts must look

6   exclusively to the holdings of the Supreme Court which existed at the time of the state

7   court's decision.  *Mitchell v. Esparza*, 540 U.S. 12, 15-15 (2003); *Yarborough v. Gentry*,

8   540 U.S. 1, 5 (2003).  When no decision of the Supreme Court "squarely addresses" an issue

9   or provides a "categorical answer" to the question before the state court, § 2254(d)(1) bars

10  relief.  *Moses v. Payne*, ___ F.3d ___, 2008 WL 4192031 (9th Cir. 2008)

11          Thus, a federal court cannot reverse a state court decision merely because that

12  decision conflicts with Ninth Circuit precedent on a federal constitutional issue.  *Brewer v.*

13  *Hall*, 378 F.3d 952, 957 (9th Cir. 2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.

14  2003).  Even if the state court neither explained its ruling nor cites United States Supreme

15  Court authority, the reviewing federal court must examine Supreme Court precedent to

16  determine whether the state court reasonably applied federal law.  *Early v. Packer*, 537 U.S.

17  3, 8 (2003).  The United States Supreme Court has expressly held that citation to federal law

18  is not required and that compliance with the habeas statute "does not even require awareness

19  of our cases, so long as neither the reasoning nor the result of the state-court decision

20  contradicts them." *Id*.

21          A state court's decision is "contrary to" federal law if it applies a rule of law

22  "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set

23  of facts that are materially indistinguishable from a decision of [the Supreme Court] and

24  nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v.*

25  *Esparza*, 540 U.S 12, 14 (2003)(citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411

26  (2000).

27

28

1        A state court decision involves an "unreasonable application of" federal law if

2    the court identifies the correct legal rule, but unreasonably applies the rule to the facts of a

3    particular case.  *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005).   An

4    incorrect application of state law does not satisfy this standard.  *Yarborough v. Alvarado*,

5    541 U.S. 652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the

6    state court's decision is objectively unreasonable.")  "It is not enough that a federal habeas

7    court, in its independent review of the legal question," is left with the "firm conviction" that

8    the state court ruling was "erroneous." *Id.*; *Andrade*, 538 U.S. at 75.  Rather, the petitioner

9    must establish that the state court decision is "objectively unreasonable."  *Middleton v.*

10   *McNeil*, 541 U.S. 433 (2004); *Andrade*, 538 U.S. at 76.

11       Additionally, a state court's factual determinations "shall be presumed to be

12   correct," on federal habeas review, and Petitioner can overcome that presumption only by

13   "rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §

14   2254(e)(1); *Bains v. Cambra*, 204 F.3d 964, 972 (9th Cir. 2000).  The burden placed on

15   petitioner is considerable because "this standard means that the federal habeas court must

16   'more than simply disagree' with the state fact-finding."  *Washington v. Schriver*, 255 F.3d

17   45, 55 (2nd Cir. 2001) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983)).

18       Where a state court decision is deemed to be "contrary to" or an "unreasonable

19   application of" clearly established federal law, the reviewing court must next determine

20   whether it resulted in constitutional error.  *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th

21   Cir. 2002).  Habeas relief is warranted only if the constitutional error at issue had a

22   "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

23   *Abrahamson*, 507 U.S. 619, 631 (1993).  In § 2254 proceedings, the federal court must

24   assess the prejudicial impact of a constitutional error in a state-court criminal proceeding

25   under *Brecht's* more forgiving "substantial and injurious effect" standard, whether or not the

26   state appellate court recognized the error and reviewed it for harmlessness under the

27   "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S.

28

1    18, 24 (1967).  *Fry v. Pliler*, ___ U.S.___, 127 S.Ct. 2321, 2328 (2007).  The *Brecht*

2    harmless error analysis also applies to habeas review of a sentencing error.  The test is

3    whether such error had a "substantial and injurious effect" on the sentence.  *Calderon v.*

4    *Coleman*, 525 U.S. 141, 145-57 (1998) (holding that for habeas relief to be granted based on

5    constitutional error in capital penalty phase, error must have had substantial and injurious

6    effect on the jury's verdict in the penalty phase.).  The Court will review Petitioner's claims

7    under the applicable standard of review.

8    **IV.  Analysis**

9            Petitioner properly exhausted state remedies as to Grounds 2, 3, 4 and 6 by

10   presenting these claims to the state courts in a procedurally proper manner.  The Court,

11   therefore, will address the merits of these claims.  Grounds 2, 3, 4 and 6 assert claims of

12   ineffective assistance of trial counsel.  As discussed below, Petitioner is not entitled to

13   habeas corpus relief on the basis of any of these claims.

14           **A.  Controlling Law**

15           The controlling Supreme Court precedent on claims of ineffective assistance of

16   counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner

17   must show that counsel's performance was objectively deficient and that counsel's deficient

18   performance prejudiced the petitioner.  *Strickland*, 466 U.S. at 687; *Hart v. Gomez*, 174 F.3d

19   1067, 1069 (9th Cir. 1999).  To be deficient, counsel's performance must fall "outside the

20   wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690. When

21   reviewing counsel's performance, the court engages a strong presumption that counsel

22   rendered adequate assistance and exercised reasonable professional judgment.  *Strickland*,

23   466 U.S. at 690.  "A fair assessment of attorney performance requires that every effort be

24   made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of

25   counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

26   time."  *Strickland*, 466 U.S. at 689.  Review of counsel's performance is "extremely

27   limited."  *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir. 1998), *rev'd on other*

28

1   *grounds*, 525 U.S. 141 (1998).  Acts or omissions that "might be considered sound trial

2   strategy" do not constitute ineffective assistance of counsel.  *Strickland*, 466 U.S. at 689.

3              To establish a Sixth Amendment violation, petitioner must also establish that he

4   suffered prejudice as a result of counsel's deficient performance.  *Strickland*, 466 U.S. at

5   691-92; *United States v. Gonzalez-Lopez*, ___U.S.___, 126 S.Ct. 2557, 2563 (2006) (stating

6   that "a violation of the Sixth Amendment right to effective representation is not 'complete'

7   until the defendant is prejudiced.")  To show prejudice, petitioner must demonstrate a

8   "reasonable probability that, but for counsel's unprofessional errors, the result of the

9   proceeding would have been different.  A reasonable probability is a probability sufficient to

10  undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Hart*, 174 F.3d at 1069;

11  *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998).  The court may proceed directly to the

12  prejudice prong. *Jackson v. Calderon*, 211 F.3d 1148, 1155 n. 3 (9th Cir. 2000) (citing

13  *Strickland*, 466 U.S. at 697).  The court, however, may not assume prejudice solely from

14  counsel's allegedly deficient performance.  *Jackson*, 211 F.3d at 1155.

15              **B.  Ground Two- Failure to *voir dire* or strike juror Clay Bush**

16              In Ground 2, Petitioner argues that his two trial counsel were ineffective for

17  failing to *voir dire* juror Clay Bush to review his bias against persons asserting a "defense-

18  of-others" theory and because counsel neither moved to strike Bush for cause nor exercised

19  a peremptory strike against him.

20              **1.  Relevant Facts**

21              During *voir dire*, the prosecutor discussed the possible defenses that might be

22  asserted at trial, including self defense or defense of a third party.  (Respondents' Exh. I at 3;

23  Exh. BB at 6; Exh. JJ at 79-84)   He advised the jury panel that under certain circumstances,

24  Petitioner would be entitled to defend his friends if he "felt they were in danger."  (*Id.*)

25  Panel member Balmer[4] responded that she would "probably. . .strongly disagree" with

26

27              [4] The transcript's reference to juror "Palmer" appears to be an error because the random

28  jury list does not include an individual named "Palmer," but includes a panel member named

Petitioner's right to raise such a defense.  (*Id*. at 82) The court struck Balmer and he did not

sit on Petitioner's jury.  (Respondents' Exh. CC at 3)  The prosecutor then inquired if any

other panel members had similar concerns, which prompted prospective juror Clay Bush to

ask the prosecutor:

> Along those same lines, if a third party was someone that you
> didn't know but they were in harm's way, would that be considered
> a third party?
>
> * * *
> If it's my wife or children or friends, obviously I know what I'd do.
> If there's a third party, circumstances would dictate what my reaction
> would be, probably.

(Respondents' Exh. JJ at 83; Exh. CC at 3)  The prosecutor responded, "that would be

designated by the law and by your factual findings also.  What we try to do at this period of

time is avoid hypotheticals, and I don't know if I can really answer that."  (*Id*.)  Bush

replied, "Fair enough."  (*Id*.)  Bush was not struck from the panel and sat as a juror.

(Respondents' Exh. CC)

The prosecutor next asked the panel members whether they would have problems

following the trial court's specific instructions on self-defense or third-party defense, if

given in this case.  (Respondents' Exh. JJ at 83-84) The record reflects that none of the

prospective jurors indicated that they would have a problem following the trial court's

instructions.  (Respondents' Exh. JJ at 83-84)

Later, out of the "hearing" of the jury panel, one of Petitioner's two defense

attorneys expressed concern to the court that "these people [do] not understand" the

justification defenses, which counsel attributed to the trial court's unwillingness to allow

counsel to use "hypotheticals" to explain those defenses.  (Respondents' Exh. JJ at 91-92)

The trial court reconsidered its position and allowed the prosecutor to further explain to the

jury panel, using basic examples, the right to defend one's self and others.  (*Id*. at 92-94)

After the prosecutor gave those examples to the jury panel, the trial court also informed the

_____

"Balmer."  (Respondents' Exh. CC at 3)

1    panel members that, if appropriate, the jury would receive "very detailed" instructions on the

2    justification defenses at a later time."  (*Id*. at 94)

3            At the conclusion of defense counsel's *voir dire*, counsel advised the jury panel

4    that "this is the only chance that you all really get to talk during the trial, so if there's

5    anything else you want to add . . . let us know."  (Respondents' Exh. JJ at 116)   None of the

6    panel members responded to counsel's invitation.  (Respondents' Exh. JJ at 116)

7            **2. Analysis**

8            As previously stated, in Ground 2, Petitioner asserts that his defense attorneys

9    were ineffective for failing to *voir dire* and/or strike juror Bush.  (docket # 1 at 6)  On post-

10   conviction review, Petitioner presented this same argument that his defense attorneys were

11   ineffective for failing to *voir dire* juror Bush to reveal his bias against persons relying on the

12   defense of others, and because counsel failed to move to strike Bush for cause or exercised a

13   peremptory strike to keep him off of the jury.  (Respondents' Exhs. I, J)

14           The state court rejected this claim.  (Respondents' Exh. J) The post-conviction

15   court concluded that, "it [was] clear that Juror Bush did not indicate by his responses that he

16   had any strong disagreements with the right of the Defendant to raise the defense of a third

17   party."  (Respondents' Exh. I at 3)  The state court further noted that Bush agreed to follow

18   the trial court's instructions in deciding the case.  (Respondents' Exh. I at 3) The court found

19   that Petitioner failed to establish that his attorneys' performance was deficient because they

20   did not ask juror Bush any additional questions related to the third-party defense.  The court

21   also found that Petitioner failed to establish that his attorneys' performance was deficient

22   because they did not use one of the defense's peremptory strikes on juror Bush.  The court

23   found that Bush's "inquiry asking for clarification as to who would be considered a third

24   party for purposes of the defense was no indication that he was biased."  (Respondents' Exh.

25   I at 4)   Finally, the state court concluded that Petitioner failed to demonstrate that he

26   suffered any prejudice because Bush sat on the jury.  (*Id.*)

27

28

1    The State court applied the correct legal standard, *Strickland*, to Petitioner's

2    claim of ineffective assistance of counsel and Petitioner has not established that its decision

3    was based on an unreasonable determination of the facts, or was either contrary to, or an

4    unreasonable application of *Strickland*.   28 U.S.C. § 2254(d)  Accordingly, Petitioner is not

5    entitled to habeas corpus relief on Ground Two.

6        Petitioner first claims that his defense attorneys were deficient for failing to

7    further question juror Bush to determine whether he was biased against a person asserting a

8    defense of others.  Although Petitioner's defense attorneys did not ask specific questions of

9    juror Bush, defense counsel recognized that the jury panel initially seemed confused

10   regarding the justification defenses.  On defense counsels' request, the court permitted

11   further explanation of those defenses and the court advised the jury panel that "very

12   detailed" instructions would be given when, and if, appropriate.  After the additional

13   explanation of the defenses, none of the panel members, including Bush, expressed any

14   problems or concerns related to those defenses.  Bush's early statements at most reflected his

15   initial misunderstanding about the third-party justification defense, rather than bias or

16   prejudice against a person asserting such a defense.  Thus, counsels' decision not to ask

17   further questions of juror Bush was not deficient performance.

18       Nor was counsels' performance deficient for failing to move to strike Bush for

19   cause or to exercise a peremptory strike against him.  Challenges for cause require the

20   challenging party to articulate the precise reason for challenging the potential juror, but the

21   decision whether to exclude a panel member for cause is vested in the trial court. *Gray v.*

22   *Mississippi*, 481 U.S. 648, 652 n. 3 (1987) ( stating that "motion to excuse a venire member

23   for cause ... must be supported by specified causes or reasons that demonstrate that, as a

24   matter of law, the venire member is not qualified to serve.") The record reflects that no

25   cause existed to strike juror Bush.  And, as previously stated, Bush's statements did not

26   reflect any bias but merely confusion which was subsequently cleared up by further

27

28

1    discussion of the justification defenses.  For that same reason, counsel were not deficient for

2    failing to use a peremptory strike to remove Bush from the jury.

3              Moreover, even assuming that counsels' performance was deficient, Petitioner

4    has not demonstrated how he was prejudiced by Bush's presence on the jury.  Petitioner

5    claims that he was prejudiced by counsels' failure to strike Bush because his presence on the

6    jury deprived him of his right to an impartial jury.  A defendant enjoys the due process right

7    "to be tried by a panel of impartial, indifferent jurors." *Jeffries v. Blodgett*, 5 F.3d 1180,

8    1189 (9th Cir.1993) (quotations omitted), *cert. denied*, 114 S.Ct. 1294 (1994). On habeas

9    review, the court must "determine whether there was such a degree of prejudice against the

10   petitioner that a fair trial was impossible." *Id*. (citation omitted). The proper test for

11   determining whether a juror is biased is "whether the juror[ ] ... had such fixed opinions that

12   [he] could not judge impartially the guilt of the defendant." *United States v.*

13   *Quintero-Barraza*, 78 F.3d 1344 (9th Cir.1995) (quoting *Patton v. Yount*, 467 U.S. 1025,

14   1035 (1984)). Bias is presumed only in "those extreme situations where the relationship

15   between a prospective juror and some aspect of the litigation is such that it is highly unlikely

16   that the average person could remain impartial in his deliberations." *Tinsley v. Borg*, 895

17   F.2d 520, 527 (9th Cir.1990) (citation omitted), *cert. denied*, 498 U.S. 1091 (1991).

18             In this case, there is no evidence that Bush has fixed opinions such that he could

19   not impartially consider Petitioner's guilt.  Nor is this a case where bias would be presumed

20   because there is not evidence of any sort of relationship between Bush and "some aspect of

21   the litigation." *Tinsley*, 895 F.2d at 527.  There is no evidence that the presence of Bush on

22   the jury deprived Petitioner of his right to an impartial jury.

23             Petitioner has failed to establish that the state court's decision was contrary to or

24   an unreasonable application of federal law.  Accordingly, he is not entitled to relief on

25   Ground Two.

26

27

28

1

### C.  Ground 3 - Failure to Introduce Evidence

2          In Ground 3, Petitioner argues that trial counsel was ineffective for failing to

3  introduce evidence of the victims' blood alcohol content during the night of the offense.

4  (docket # 1at 7)  As discussed below, trial counsel's decision not to introduce such evidence

5  was sound trial strategy and Petitioner has not established that the state court's denial of

6  Petitioner's claim was either contrary to or an unreasonable application of *Strickland*.

7          **1.  Relevant Facts**

8          The toxicology reports from the Maricopa County Medical Examiner's Officer

9  indicated that the victims had the following blood alcohol levels: Russ Schultz .09%; Mike

10  Ramos .06 %; and Adrian Rodriguez .09%.  (Respondents' Exh. DD)  Additionally,

11  Schultz's blood analysis was positive for a small concentration of amphetamine.  (*Id.*)  At

12  trial, Forrest Wald testified that he and his friends, the victims, purchased a 12-pack of beer

13  on their way to the first nightclub they visited the night of the shooting.  (Respondents' Exh.

14  BB at 8; Exh. GG at 82-83)  He further testified that he had an additional four or five drinks

15  at that first club.  (Respondents' Exh. BB at 8; Exh. GG at 85)  Wald also testified that on

16  the way to the club where the shooting occurred, he and his friends drank more beer.

17  (Respondents' Exh. BB at 8; Exh. KK at 65-68)

18          On cross-examination, Wald admitted that in addition to drinking 4 or 5 beers at

19  the first club, he also had a shot of tequila.  (Respondents' Exh. KK at 66) Wald estimated

20  that he consumed between seven and nine drinks that night, and that his blood alcohol

21  content was about .10%.  (*Id.*)  He testified that all of the victims had been drinking that

22  night, stating that Schultz and Rodriguez had consumed about the same amount as he had,

23  but Ramos had consumed less.  (*Id.*)  During closing argument, defense counsel argued that

24  Wald was "so drunk, so high, so out of it that he was incapable of perceiving what was

25  going on."  (Respondents' Exh. BB at 9; Tr. 3/29 at 78, 86)

26

27

28

## 2. Analysis

Petitioner asserts that his defense attorneys were ineffective for failing to introduce the toxicology reports that indicated that the all three victims had elevated blood alcohol levels and that Schultz also had evidence of amphetamine in his blood. Petitioner argues that such information supported his defense theory that the victims were the aggressors and would have impeached Wald's testimony which suggested that Ramos was not very intoxicated at the time of the shooting. (docket # 1 at 7) Petitioner presented this same claim on post-conviction review and was denied relief. (Respondents' Exhs. I, J) As discussed below, Petitioner fails to establish that the State court's resolution of this claim was contrary to, or an unreasonable application of, *Strickland*.

In his first petition for post-conviction relief, Petitioner argued that his defense attorneys were ineffective for failing to urge the admission of the toxicology reports. He argued, based on *State v. Plew*, 155 Ariz. 44, 745 P.2d 102 (1987), that evidence of alcohol intoxication and blood alcohol content was relevant to his claim that the victim was the aggressor and was admissible under Arizona law. (Respondents' Exh. J at 10) The state court found *Plew* distinguishable from Petitioner's case. (Respondents' Exh. I) In *Plew*, defendant claimed that the victim became aggressive after ingesting cocaine and attacked defendant, who then shot the victim in self defense. In support of that defense, defendant offered an expert who would have testified that a person intoxicated on cocaine would be abnormally aggressive and able to sustain severe bodily injury without necessarily feeling the pain. The appellate court held that the trial court erred in precluding the expert testimony because, unlike alcohol intoxication, the effects of cocaine intoxication were not within the common experience and knowledge of the jury. The Arizona Supreme Court has held that the effect of alcohol intoxication is a subject matter within the common knowledge and experience of jurors. *State v. Hicks*, 133 Ariz. 64, 71, 649 P.2d 267, 274.

After distinguishing *Plew*, the state court concluded that Petitioner failed to establish that his defense attorneys were ineffective for failing to introduce the toxicology

- 27 -

1   reports in this case.  (Respondents' Exh. I at 4-5)  Petitioner has not shown that this decision

2   was based on an unreasonable determination of the facts, or that it was either contrary to, or

3   rested on an unreasonable interpretation of *Strickland*.

4          Defense counsel has a "duty to make reasonable investigations or to make

5   reasonable decisions that make particular investigations unnecessary."  *Strickland*, 466 U.S.

6   at 691.  "This includes a duty to investigate the defendants's 'most important defense,' . . .

7   and a duty adequately to investigate and introduce into evidence records that demonstrate

8   factual innocence, or that raise sufficient doubt on that question to undermine confidence on

9   the verdict . . . ." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (citations omitted).

10  Here, defense counsel investigated the intoxication of the victims and was aware of the

11  toxicology reports.  Defense counsel made a strategic decision not to introduce that

12  evidence, which was not only redundant in view of Wald's testimony that the victims had

13  been drinking on the night in question, but was less powerful than Wald's testimony because

14  the toxicology reports indicated that the victims' blood alcohol levels were lower than the

15  .10 % that Wald estimated on cross-examination.

16          Although Petitioner's defense attorneys did not present the toxicology reports,

17  the victims' friend, Wald, testified regarding the victims' alcohol consumption.  He testified

18  that on the night in question, he and his friends bought a 12-pack of beer and drank some

19  beer on the way to a Scottsdale club.  Wald testified that he drank 4-5 more drinks before

20  leaving for a second club.  On cross-examination, counsel elicited from Wald that, in

21  addition to the four or five beers at the first club, he also had a tequila shot and drank

22  another beer on the way to the second club.  Wald admitted that he had between 7 and 9

23  drinks and estimated that his blood alcohol content was about .10%.  Wald also admitted

24  that the victims drank about the same amount has he did, except for Ramos who drank less

25  but at least four drinks.  (Respondents' Exh. BB at 8; Exh. KK at 65-67)  Wald's testimony

26  was more powerful that than toxicology reports which indicated that the victims' blood

27  alcohol content was lower than the legal limit for intoxication, and could have allowed a

28

1    rational juror to infer that the victims were less intoxicated than Wald's testimony suggested.

2    Thus, trial counsels' decision not to introduce the toxicology results was not deficient

3    performance. *See Harris v. Pulley*, 885 F.2d 1354, 1368 (9th Cir. 1989) (concluding that

4    petitioner, who had the burden of proof, failed to "overcome the 'strong presumption' that

5    [defense] counsel's failure to introduce the 1971 EEG results . . . fell within the 'wide range

6    of reasonable professional assistance.'" And concluding that "[b]ecause it is possible that the

7    failure to introduce the abnormal EEG results was a difficult but thoughtful tactical decision,

8    we must presume that counsel's conduct was within the range of competency.")

9           Moreover, Petitioner has not shown that he was prejudiced as a result of his

10   defense attorneys' failure to introduce the toxicology reports.  Petitioner has not made any

11   showing that, but for counsel's deficient performance, there is a reasonable probability that

12   the result of the proceeding would have been different.  The jurors were aware from Wald's

13   testimony that he estimated his own blood alcohol content at .10% and that Schultz and

14   Rodriguez consumed about the same amount of alcohol that evening, but that Ramos had

15   less.  If the actual toxicology results been admitted, they would have indicated that the

16   victims' were less intoxicated, not more intoxicated, as Petitioner wanted to argue in support

17   of his theory that there is direct correlation between intoxication and aggression.

18          Finally, the trial court's determination that Petitioner's attorneys were not

19   ineffective for failing to introduce evidence reflecting trace amount of amphetamine in

20   Schultz's blood was not contrary to, or an unreasonable application of, *Strickland*.

21   Petitioner does not argue that one of the effects of amphetamine is aggressive behavior, has

22   presented no testimony or other evidence to that effect, and thus, the evidence was not

23   relevant for any purpose.  In view of the foregoing, Petitioner is not entitled to habeas corpus

24   relief based on Ground 3.

25                      **D.  Ground 4 - Failure to Call Witness**

26          In Ground 4, Petitioner argues that his defense attorneys were ineffective for

27   failing to call Daryl Jones as a witness at trial.  (docket # 1 at 8)  Petitioner argues that Jones

28

1  would have testified that Petitioner fired a warning shot, supporting Petitioner's claim that

2  he shot Ramos in self defense.  (*Id.*)   Petitioner presented this same claim on post-

3  conviction review and the state court denied relief.  (Respondents' Exh. I, J)  Petitioner has

4  not established that the state court's denial of Petitioner's claim was contrary to, or an

5  unreasonable application of, *Strickland*.

6          Petitioner contends that his defense attorneys were ineffective for failing to call

7  Jones to testify that Petitioner fired a warning shot before shooting Ramos in self defense.

8  In support of that claim, Petitioner states that during Jones' interview with police, which was

9  provided to defense counsel, Jones stated that "when the petitioner pulled out the pistol and

10 the first aggressor refused to back up, petitioner fired a round in the air."  (docket #  1 at 8)

11 Petitioner argues that Jones was the only witness "close enough to the incident to provide

12 significant details to indicate the self-defense nature of petitioner's actions and trial counsel

13 failed competently to represent [Petitioner] by not calling him."  (docket # 1 at 8)  Petitioner

14 further argues that trial counsel were ineffective for failing to challenge the prosecutor's

15 closing argument which "stressed that no witnesses testified that there were any warning

16 shots fired by anyone."  (docket # 1 at 8)

17         "The power to decide questions of trial strategy and tactics rests with counsel and

18 the decision as to what witnesses to call is a tactical, strategic decision." *Faretta v.*

19 *California*, 422 U.S. 806 (1975).  "There are a number of reasons why an attorney may

20 choose not to call a witness, including a concern that . . . his participation in the defense may

21 harm the defendant more that his testimony . . . will aid him." *State v. Goswick*, 142 Ariz.

22 582, 586, 691 P.2d 673, 677 (Ariz. 1984).  "[C]omplaints of uncalled witnesses are not

23 favored in federal habeas corpus review because allegations of what the witness would have

24 testified are largely speculative . . . . In addition, for [petitioner] to demonstrate the requisite

25 *Strickland* prejudice, [he] must show not only that [the] testimony would have been

26 favorable, but also that the witness would have testified at trial." *Evans v. Cockrell*, 285

27 F.3d 370, 377 (5th Cir. 2002) (citations omitted); *see also United States v. Hardin*, 846 F.2d

28

1  1229, 1231-32 (9th Cir. 1988) (rejecting claim of ineffective assistance based on counsels'

2  failure to call a witness who would have taken responsibility for a gun found in

3  defendant's possession because, *inter alia*, "[t]here is no evidence in the record which

4  establishes that Washington would testify in [petitioner's] trial.").

5  As an initial matter, Petitioner has not presented any evidence indicating that

6  Jones was available to testify at Petitioner's trial or that he would have testified consistently

7  with his prior statement to police.  (docket # 1 at 8) Thus, Petitioner's contention that Jones'

8  testimony would have aided his defense is merely speculative.

9  Moreover, Petitioner has not established any prejudice as a result of counsel's

10  failure to call Jones as a witness.  Here, as the trial court noted on post-conviction review,

11  Petitioner testified that Jones was drinking malt liquor and that he "was pretty buzzed" at the

12  time of the shooting.  (Respondents' Exh. BB at 10; Exh. HH at 96, 104) As a result, Jones'

13  testimony relating to the events in question would have been unreliable.

14  Additionally, Jones' testimony that Petitioner fired a warning shot before

15  shooting Ramos would have been cumulative because several other witnesses testified that

16  Petitioner had fired a warning shot before shooting Ramos.  (Respondents' Exh. I at 6; Exh.

17  LL)  Because the jury heard testimony that Petitioner had fired a warning shot before

18  shooting Ramos, even if defense counsel called Jones to provide the same testimony, there is

19  no reasonable probability that the outcome of Petitioner's trial would have been different.

20  Petitioner has not met his burden of establishing prejudice.

21  Additionally, contrary to Petitioner's assertion that there was no challenge to the

22  prosecutor's statement during closing argument that no warning shots were fired, defense

23  counsel argued that five witnesses, in addition to Petitioner, testified that Petitioner fired

24  warning shots.  Defense counsel argued:

25  [T]here's only two people, two people, who said there was no warning
   shots (sic) fired, and that is Forrest Wald and Ray Guy Cooper, the man
26  who sees everything, knows everything, the omnipotent one.

27  Who said that there were warning shots?  Officer Chris Wilson - that's
   what draws their attention to this whole situation.  They're over there -
28

> Chris Wilson is over here talking to the — some gals, and that's what draws their attention, him and Officer McCullough.
>
> Officer McCullough acknowledges the same thing.  Dan Good, the supervisor of Ray Guy Cooper, the person who couldn't identify Ryan but he said, 'Yeah, I can't — I can't pick him out' but was actually very accurate in everything else that he said.
>
> Nicci Hamilton — and then of course, the State brought up Jake Shoulders, too, and what is he saying? He's saying that there were warning shots.  That was what Ryan [Petitioner] confided to him and then, of course, Ryan [Petitioner].

(Respondents' Exh. I at 6; Exh. LL at 67-68)  Thus, contrary to Petitioner's claim, his defense attorneys presented substantial evidence at trial to contradict Wald's testimony that no warning shots were fired.  "Counsel's tactical decisions at trial . . . are given great deference . . . ."  *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).  Petitioner has not established that his defense attorneys' strategic decision not to call Jones as a witness constituted ineffective assistance of counsel.

### E.  Ground 6 - Jury Instruction

In Ground 6, Petitioner argues that trial counsel was ineffective for failing to object to the trial court's supplemental jury instructions regarding citizen's arrest, which was given in response to a jury question during deliberations.  (docket # 1 at 10)

#### 1.  Relevant Facts

During the jury instruction conference between the court and counsel, the State requested a jury instruction regarding citizen's arrest.  (Respondents' Exh. I at 9; Exh. BB at 11) The trial court declined to issue the instruction, concluding that the evidence did not support such an instruction.  (*Id.*)  During deliberations, the jury sought clarification on the self-defense instructions:

> As to self-defense . . . 'A reasonable person would have believed that physical force . . . to protect against another's use of unlawful physical force.' Question: X witnesses a shooting (crime).  If X tries to stop the shooter by force — is it lawful physical force?

(Respondents' Exh. I at 9)  After conferring with counsel, the court proposed the following supplemental jury instruction:

The question whether unlawful physical force was being used or whether such force was lawful is a determination that you must make based upon your consideration of all of the evidence presented in the case.  To assist you in making that determination, you should consider all of the instructions that have been previously provided to you, and you may consider the following additional instructions:

The law provides that a private person may make an arrest when the person to be arrested has committed a crime in his presence.

A private person, when making an arrest, shall inform the person to be arrested of the intention to arrest him and the cause of the arrest, unless he is then engaged in the commission of an offense or is pursued immediately after its commission or flees or forcibly resists before the person making the arrest has the opportunity to so inform him or when the giving of such information will imperil the arrest.

No unnecessary or unreasonable force shall be used in making an arrest, and the person arrested shall not be subjected to any greater restraint than necessary for his detention.

(Respondents' Exh. I at 9)

Defense counsel initially objected on the ground that the proposed instruction might shift the burden of proof to defendant.  (Respondents' Exh. I at 9)  After further discussion, the parties agreed to the proposed instruction with the following additional language regarding the burden of proof:

A private person who is attempting to arrest another person has no right to use physical force against third parties who were not involved in the commission of any criminal conduct.

Keep in mind that it is the burden of the State to prove beyond a reasonable doubt that the Defendant was not acting in self-defense or in defense of a third party.  This burden means that the State is required to prove beyond a reasonable doubt that any physical force used against the Defendant was lawful.

(Respondents' Exh. I at 9-10)

**2. Analysis**

Petitioner argues that there was insufficient evidence to support an instruction regarding citizen's arrest, and therefore, trial counsel was ineffective for failing to object to this instruction.

Petitioner raised this claim on direct appeal.  The Arizona Court of Appeals held that, "We disagree [with Petitioner's claim] since the jurors could have reasonably inferred

1   from the victim and eyewitness testimony at trial that the victims against whom defendant

2   defended himself had the legal authority to make a citizen's arrest after the first victim was

3   shot, and were, in fact attempting to arrest or detain the defendant."  (Respondents' Exh. B

4   at 6)   Because the appellate court concluded that sufficient evidence supported the

5   supplemental jury instruction, it concluded that defense counsel was not ineffective for

6   failing to object to that instruction.  (Respondents' Exh. B) Petitioner has not established that

7   the Court of Appeals decision was contrary to, or an unreasonable application of, *Strickland*.

8          As the state court found, the evidence at trial was sufficient to support a citizen's

9   arrest instruction.  After Ramos was shot, his friends - who, with the exception of Wald,

10   were eventually victims - attempted to prevent Petitioner from leaving the scene in a car.

11   The evidence showed that the men surrounded the car, jumped on it, and kicked it.

12   (Respondents' Exh. I)  Honnaker testified that after Petitioner and his friends entered the car

13   to leave the club, "[p]eople were coming at the back of the car . . . a lot of people were . . .

14   pushing on the car."  (Respondents' Exh. II at 50)  She further testified that someone got on

15   the trunk of the car.  (Respondents' Exh. II at 50)   Wald testified that after Ramos was shot,

16   he ran to "chase after the gunman."  (Respondents' Exh. KK at 67-68) There was sufficient

17   evidence from which the jury could have reasonably inferred that the victims had the legal

18   authority to make a citizen's arrest after the first victim was shot, and were attempting to

19   arrest or detain Petitioner.  This evidence supported the applicable citizen's arrest jury

20   instruction.  *See* A.R.S. § 13-3883, 13- 3884[5], 3889.

21

22          [5] Arizona Revised Statute § 13-3884 provides that:

23   A private person may make an arrest:

24

25   1. When the person to be arrested has in his presence committed a misdemeanor
     amounting to a breach of the peace, or a felony.

26

27   2. When a felony has been in fact committed and he has reasonable ground to believe
     that the person to be arrested has committed it.

28

1    Petitioner further argues that trial counsel was ineffective for failing to object to

2    the supplemental jury instruction because it impermissibly shifted the burden of proof to the

3    defense.  (Respondents' Exh. U at 10)  Contrary to Petitioner's assertion, counsel did object

4    to the first proposed supplemental jury instruction on the ground that it might shift the

5    burden of proof.   After further discussion with the court and the prosecutor, the parties

6    agreed to a modified supplemental jury instruction that included specific language regarding

7    the burden of proof.   The additional language emphasized that it was

8    > the burden of the State to prove beyond a reasonable doubt that the Defendant
     > was not acting in self-defense or in defense of a third party.
9    > This burden means that the State is required to prove beyond a reasonable
     > doubt that any physical force used against the Defendant was lawful.
10
     (Respondents' Exh. I at 9-10)  The supplemental instruction that was given to the jury
11
     corrected any problems with the proposed instruction by emphasizing the State's burden of
12
     proof.  The supplemental jury instruction did not improperly shift the burden of proof to
13
     Petitioner.  Accordingly, counsel was not ineffective for failing to object to the supplemental
14
     instruction that was given to the jury.
15
     **V.  Conclusion**
16
     Based on the foregoing, the Court finds that Petitioner's claims are either
17
     procedurally defaulted or fail on the merits.
18
     Accordingly,
19
     **IT IS HEREBY RECOMMENDED** that Petitioner's Petition (docket #  1) and
20
     Amended Petition for Writ of Habeas Corpus (docket # 26) be **DENIED.**
21
     This recommendation is not an order that is immediately appealable to the Ninth
22
     Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of
23
     Appellate Procedure, should not be filed until entry of the District Court's judgment.  The
24
     parties shall have ten days from the date of service of a copy of this recommendation within
25
     which to file specific written objections with the Court.  *See,* 28 U.S.C. § 636(b)(1); Rules
26

27    _____

28

72, 6(a), 6(e), Federal Rules of Civil Procedure.  Thereafter, the parties have ten days within which to file a response to the objections.  Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review.  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

DATED this 9th day of February, 2009.


Lawrence O. Anderson
United States Magistrate Judge